UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CLINTON H. CAMPBELL; THOMAS W.
DILLON; JERRY HERSHMAN; STEVEN
D. ISAACS; CHARLES L. MARTIN;
DAVID S. MCNEELY; DAVID MILLER;
JASON MORRIS; SCOTTY PARSONS;
TONY RUMBERG; MATTHEW C.
TAYLOR; and SHAWN LEGG,

      Plaintiffs,

v.                               Civil Action No. 2:07-0651

BROOK TROUT COAL, LLC,
a West Virginia Limited Liability
Company; MAGNUM COAL COMPANY,
a Delaware Corporation; MAGNUM
COAL SALES LLC, a West Virginia
Limited Liability Company; NELSON
BROTHERS, LLC, a Delaware Limited
Liability Company; CATENARY COAL
COMPANY, LLC, a Delaware Limited
Liability Company; EXPLO SYSTEMS,
INC., a Louisiana Corporation;
ELITE COAL SERVICES, L.L.C.,
a West Virginia Limited Liability
Company; and JOHN RUCKER,

      Defendants.

MEMORANDUM OPINION AND ORDER

      Pending are (1) the plaintiffs' motion to remand, filed

November 16, 2007; (2) the motion of Explo Systems, Inc.

("Explo") to dismiss, filed October 24, 2007; (3) the motion of

Elite Coal Services, L.L.C. ("Elite") to dismiss, filed November

19, 2007, (4) the amended motion of Elite to dismiss, filed

November 20, 2007; (5) the motion of Nelson Brothers, LLC ("Nelson Brothers") and John Rucker to compel arbitration and to stay proceedings pending arbitration, filed January 18, 2008, (6) the corrected motion of Nelson Brothers and John Rucker to compel arbitration and to stay proceedings pending arbitration, filed January 21, 2008; and (7) the motion of plaintiffs to defer response to the motion to compel arbitration and stay proceedings, filed January 21, 2008.[1]

I.

According to the "first amended complaint," plaintiffs were exposed to the dangerous toxin, tetryl, during their employment with Nelson Brothers. (1st Am. Compl. ¶¶ 1, 9, 10, 26, attached as Ex. A to Explo's M.T.D.).

Explo contracted with the United States Army ("Army"), on November 16, 2006, to demilitarize munitions containing tetryl at three mine sites. (Explo-Army Contract §§ 3.1, 4.1, attached

---

[1] It is ORDERED that the motions of the plaintiffs, filed November 16, 2007 and November 19, 2007, respectively, to exceed the page limit in their memorandum in support of the motion to remand and in their memorandum in opposition to Explo's motion to dismiss be, and they hereby are, granted.

as Ex. B to Not. of Rem.).  The contract states:[2]

1.0  SCOPE:

1.1  Explo Systems Inc. shall provide all the necessary
material, equipment, property, licenses, permits, and
personnel to perform the demilitarization[3] of 250,000
to 500,000 lbs of various Government owned artillery
boosters and fuze components that are unsafe for
extensive handling or transportation.  The
demilitarization will be coordinated with the Munitions
Assessment Renovation Inspection and Demilitarization
(MARID) team activities at Talon Manufacturing Inc. in
West Virginia.  It is anticipated that this effort
should be accomplished in approximately ninety days

---

[2] **The contract between Explo and the Army may be considered
in the remand analysis inasmuch as a court may view a notice of
removal and its exhibits in deciding whether the action was
improvidently removed.  See 14C Charles Alan Wright et al.,
Federal Practice & Procedure § 3739, at 468 (3d ed. 1998).  On
the other hand, in deciding a motion to dismiss, a court should
consider only the operative complaint and those materials
integral to it.  Secretary of State for Defence v. Trimble
Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007); Phillips v.
LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999); Charles A.
Wright & Arthur R. Miller, 5A Federal Practice and Procedure §
1327 (2008).**

[3] **Demilitarization is defined in the contract as
"encompass[ing] various approved methods such as mutilation,
destruction, or alteration to prevent further use for its
originally intended military purpose."  (Explo-Army Contract §§
3.1, 4.1, attached as Ex. B to Not. of Rem.).**

3

from start-up.

(Id. § 1.1).

Explo then contracted with various contractors and
subcontractors, including many of the defendants, most notably
plaintiffs' employer, Nelson Brothers, to complete its contract
with the Army.  (Pls.' Resp. to M.T.D. at 2-3, citing 1st Am.
Compl. ¶¶ 11, 12, 15).  As employees of Nelson Brothers and under
the direction of their supervisor, defendant John Rucker,
plaintiffs were allegedly exposed to tetryl.  (1st Am. Compl. ¶¶
10-11).

The first amended complaint alleges that plaintiffs
"disposed of" tetryl, (id. ¶¶ 22, 31), and used it "as an
explosive in performance of the contract."  (Id. ¶¶ 11, 15, 21,
24).  In the facts section of their response to the motion to
dismiss, plaintiffs stated, "Explo notes that it entered into a
contract in November of 2006 with the United States Army whereby
Explo assumed responsibility for disposing of Army-owned
munitions, such munitions containing the toxic chemical Tetryl."
(Pls.' Resp. to Explo M.T.D. at 2, citing Explo Memo. in Supp. of
M.T.D. at 2-3).  Explo has consistently maintained, including by
affidavit from its vice president, David Smith, that the
government-furnished material to be demilitarized contained

4

tetryl.  (Not. of Rem. ¶¶ 2-3; Explo's Resp. to Mot. to Rem. at
2; Smith Aff't ¶¶ 2-4, attached as Ex. C to Not. of Rem.).
Plaintiffs have not disputed this assertion of fact.  It thus
appears from plaintiffs' acquiescence in, and citation of,
Explo's recitation of the facts, that tetryl was in the
government-furnished munitions to be demilitarized, not in
explosives brought into the mine by Explo or another party for
the purposes of demilitarization.  Clarification of this point is
important for the discussion of whether remand is appropriate.

        On September 25, 2007, plaintiffs filed this action in
the Circuit Court of Boone County and amended their complaint on
October 5, 2007.  The first amended complaint consists of six
counts, stating state-law claims of negligence (Count I),
deliberate intent (Count II), ultrahazardous strict liability
(Count III), fraud (Count IV), medical monitoring (Count V), and
"infliction of emotional distress" (Count VI).  On October 17,
2007, Explo filed a notice of removal on the basis of the federal
officer removal statute, 28 U.S.C. § 1442(a)(1), with a
suggestion of supplemental jurisdiction over any other claims
existing under 28 U.S.C. § 1367.[4]

_____

        [4]  Although the notice of removal refers briefly to the
existence of federal question jurisdiction under 28 U.S.C. §
1331, Explo does not specify the grounds for such jurisdiction.

In assessing whether there is jurisdiction, the Counts in the first amended complaint can be broken down into two groups.  The first group includes Counts I, II, and IV.  Counts I and II allege that the defendants failed to warn or train plaintiffs of the dangers of tetryl and failed to provide safety gear and equipment.  (1st Am. Compl. ¶¶ 30, 32, 33, 36).  Count I adds an allegation regarding the failure of the defendants in "advising, requesting or instructing plaintiffs to take Tetryl to their homes."  (Id. ¶ 34).

Paragraph 31, found in Count I, is an outlier.  (Id. ¶ 31).  Its assertion that "[i]n disposing of Tetryl, plaintiffs were required to work in abnormally dangerous conditions[,]" is more properly characterized as a strict liability allegation, which claim is alleged in Count III.  See In re Flood Litig., 216 W. Va. 534, 544, 607 S.E.2d 863, 873 (2004) ("Since the decision of Peneschi v. National Steel Corp. v. Koppers Co., Inc., 170 W. Va. 511, 515, 295 S.E.2d 1, 5 (1982), West Virginia law has abided by the principle articulated in the famous torts case of Rylands[5] that "'where a person chooses to use an abnormally dangerous instrumentality he is strictly liable without a showing

---

[5] Rylands v. Fletcher, (1868) L.R. 3 H.L. 330.

6

of negligence for any injury proximately caused by that
instrumentality.'").

Within the first grouping, the court includes Count IV,
which like Counts I and II, focuses on the defendants' failures
or misconduct rather than simply the plaintiffs' exposure to
tetryl.  Count IV alleges defendants misrepresented, or failed to
inform the plaintiffs of, the danger that tetryl posed to
plaintiffs and their families.  (1ˢᵗ Am. Compl. ¶¶ 44-45, 47).

The second group consists of only Count III.  This
count alleges that the defendants "exposed plaintiffs to an
ultra-hazardous product and working conditions," and are
therefore strictly liable. (Id. ¶¶ 42-43).

Counts V (medical monitoring) and VI (infliction of
emotional distress) are excluded from the remand analysis because
they are for damages derivative of liability on the preceding
four Counts.

II.

The federal officer removal statute is a statutory
exception to the well-pleaded complaint rule and permits removal

7

by

> [t]he United States or any agency thereof or any
> officer (or any person acting under that officer) of
> the United States or of any agency thereof, sued in an
> official or individual capacity for any act under color
> of such office . . .

28 U.S.C. § 1442(a)(1).  The statute is rooted in federal

supremacy and a mistrust of the ability of state courts to

protect federal interests.  Watson v. Philip Morris Companies,

Inc., 127 S.Ct. 2301, 2305 (2007).  As the Supreme Court has

explained, "Congress has decided that federal officers, and

indeed the Federal Government itself, require the protection of a

federal forum."  Willingham v. Morgan, 395 U.S. 402, 407 (1969).

The statute is meant to protect the federal government from the

interference with its operations that would occur were a state

able to haul federal officers acting within the scope of their

authority into state court.  Watson, 127 S.Ct. at 2306; see also,

14C Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal

Practice & Procedure, § 3727 (3d ed. 2001).

        To qualify under section 1442(a)(1), a defendant must:

(1) be a "person" within the meaning of the statute; (2) act

under the direction of a federal officer; (3) show a nexus or

"causal connection" between the alleged conduct and the official

authority; and (4) have a colorable federal defense.  See

<u>Jefferson County v. Acker</u>, 527 U.S. 423, 431 (1999); <u>Mesa v.
California</u>, 489 U.S. 121, 125 (1989); <u>Isaacson v. Dow Chemical
Co.</u>, 517 F.3d 129, 135 (2nd Cir. 2008); <u>United States v. Todd</u>,
245 F.3d 691, 693 (8th Cir. 2001); <u>Paldrmic v. Altria Corp.
Servs., Inc.</u>, 327 F. Supp.2d 959, 964 (E.D. Wis. 2004); <u>Virden v.
Altria Group, Inc.</u>, 304 F. Supp.2d 832, 843 (N.D. W. Va. 2004).
It is the removing defendant's burden to establish federal
jurisdiction under the federal officer removal statute.  <u>Winters
v. Diamond Shamrock Chemical Co.</u>, 149 F.3d 387, 397 (5th Cir.
1998).  Plaintiffs argue that Explo has not satisfied the second,
third, or fourth requirements.[6]

      The statute must be liberally construed but its "broad
language is not limitless.  And a liberal construction
nonetheless can find limits in a text's language, context,
history, and purposes."  <u>Watson</u>, 127 S.Ct. at 2304-05.  The
liberal construction is further tempered by the limited

---

[6] Plaintiff does not dispute the first requirement that
Explo is considered a "person" under the federal officer removal
statute.  At least two courts of appeals and other district
courts have found a corporation may be considered a "person"
within the meaning of the statute.  <u>See</u> <u>In re Methyl Tertiary
Butyl Esther ("MTBE") Prods. Liab. Litig.</u>, 488 F.3d 112, 124 (2nd
Cir. 2007); <u>Winters</u>, 149 F.3d at 398; <u>Good v. Armstrong World
Indus., Inc.</u>, 914 F. Supp. 1125, 1127-28 (E.D. Pa. 1996); <u>Pack v.
AC & S, Inc.</u>, 838 F. Supp. 1099, 1102-03 (D. Md. 1993); <u>Fung v.
Abex Corp.</u>, 816 F. Supp. 569, 572 (N.D. Cal. 1992).

jurisdiction of federal courts which "is not to be expanded by judicial decree" since federal courts "possess only that power authorized by [the] Constitution and statute." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994). Moreover, "courts should resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." <u>Hartley v. CSX Transp., Inc.</u>, 187 F.3d 422, 425 (4th Cir. 1999).

      A.  Counts I, II, and IV

      The United States Supreme Court has recognized that "[t]o satisfy the [acting under color of office] requirement, the officer must show a nexus, a 'causal connection' between the charged conduct and asserted official authority." <u>Acker</u>, 527 U.S. at 431 (internal citation omitted).  Such a showing is made by a defendant when it demonstrates that "'the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations.'" <u>Virden</u>, 304 F. Supp.2d at 844 (internal quotation omitted).  Addressing the causal connection requirement, the Supreme Court has observed that the defendant "must by direct averment exclude the possibility that it [the state court action] was based on acts or conduct of his not

10

justified by his federal duty."   Mesa, 489 U.S. at 132.

Because the materials furnished by the Army for demilitarization allegedly contained tetryl, Explo argues there is a causal connection between the "government control under which Explo acted and the injuries alleged by plaintiff[s]." (Resp. to Mot. to Rem. at 10-11).  The allegations of misconduct which forms the basis of Counts I, II, and IV -- the defendants' failure to warn or train, failure to provide protective clothing and equipment, instruction to plaintiffs to take tetryl home, and misrepresentations or omissions regarding the danger tetryl posed to plaintiffs and their families -- were not a result of the direction or control of the Army or any of its officers.  (1st Am. Compl. ¶¶ 30, 32, 33, 34, 36, 44, 45, 47).  There were no orders or direction from federal officers that prevented Explo from fulfilling its duties to the plaintiffs described in Counts I, II, and IV, including meeting various OSHA regulations and state requirements.  As a consequence, there is no causal connection between the conduct complained of in Counts I, II, and IV and the federal direction.  See Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F. Supp.2d 1144, 1155 (D. Colo. 2002) (removing defendants had not satisfied the causal connection requirement because defendants failed to show the

11

agency's "direction and control of their activities directly
interfered with their ability to fulfill their state law
obligation to warn employees of safety hazards."); see also,
Faulk v. Owens-Corning Fiberglass Corp., 48 F. Supp.2d 653, 663
(E.D. Tex. 1999) (claims for failure to warn could not be removed
under the federal officer removal statute inasmuch as "the
federal government provided no direction or control on warnings .
. . [and] did not prevent Defendants from taking their own safety
precautions heeding state-law standards.").

It is not that the Army prohibited Explo from complying
with OSHA requirements and West Virginia law.  The opposite is
true.  Section 3.3 of the contract specifically states that Explo
must comply with applicable safety laws and regulations.  (Explo-
Army Contract § 3.3, attached as Ex. B to Not. of Rem.).[7]  The

_____

[7] Section 3.3 of Explo's contract with the Army states:
3.3.  Safety -- Explo Systems Inc. shall
comply with all applicable Federal, State,
and local safety regulations and requirements
for the receipt, handling, and
demilitarization of 250,000 to 500,000 lbs.
of various artillery boosters and fuze
components.  Nothing in this scope of work
relieves Explo Systems Inc. of the
responsibility for compliance with Federal,
State, and local laws, ordinances, codes, and
regulations, including applicable portions of
Occupational Safety and Health Administration
(OSHA) requirements.  Explo Systems Inc.
shall use trained and certified employees for

12

Army's contractual requirement that Explo comply with state law
and OSHA regulations invalidates Explo's position that its
contract with the Army caused the conduct complained of in Counts
I, II, and IV.

Moreover, Explo was given considerable latitude under
the contract to accomplish the demilitarization.  For example,
although section 3.1 of the contract required closed detonation
for the demilitarization, the direction as to how to accomplish
that end was sparse.  (Id. § 3.1).  It simply provided that,
"Explo Systems Inc. shall establish a capability for the receipt,
handling, and demilitarization of a variety [of] artillery
boosters and fuze components . . . ."  (Id.).  Section 3.2
explicitly stated that a demilitarization or disposal plan was
not required.  (Id. § 3.2).

Explo's vice president avers that the contract mandated
to Explo the time, location, and means by which the
demilitarization must take place.  (Smith Aff't ¶¶ 2-7, 9,
attached as Ex. C to Not. of Rem.).  The contract did not,
however, direct activities in such a way that prevented Explo

_____

                    this effort, in compliance with applicable
                    Federal, State, and local laws and
                    regulations.
(Explo-Army Contract § 3.3, attached as Ex. B to Not. of Rem.)

13

from adhering to applicable safety regulations.  (Reply to Resp.
to Mot. to Rem. at 5 n. 1).

        Section 2.2 of the contract Explo had with the Army is
repeatedly cited by Explo.  (Resp. to Mot. to Rem. at 10-13, 16).
It defines "contained detonation" as "[c]onfined, violent
reaction of PEP or explosive ordinance without the control of the
combustion air but the containment of the combustion reaction in
an enclosed device or space, and without control of emission of
gaseous particulate combustion products."  (Explo-Army Contract §
2.2, attached as Ex. B to Not. of Rem.) (emphasis added).  Explo
extracts the last phrase, as underlined, in an effort to portray
its contract with the Army as mandating "that Explo not perform
any control of emissions of Tetryl."  (Resp. to Mot. to Rem. at
12).  This contractual definition simply did not prohibit Explo
from providing warnings, training, or safety gear.  Nor did it
compel Explo to commit fraud.  Moreover, there is no reason to
think that portion of the definition contradicts the requirement
in Section 3.3 that Explo comply with all applicable safety laws
and regulations.

        Having found that Explo has not met the causal
connection requirement, the court need not consider any of the
three other federal officer removal requirements with respect to

                              14

Counts I, II and IV.


       B.   Count III


      After incorporating the preceding paragraphs of the
first amended complaint, Count III, the claim for strict
liability, provides:

> 42.  The aforesaid conduct exposed plaintiffs to an
>      ultra-hazardous product and working conditions,
>      and defendants are strictly liable to plaintiffs.
>
> 43.  As a proximate result of defendants' intentional
>      exposure of plaintiffs to an ultra-hazardous
>      product, plaintiffs were injured as described
>      above.

(1st Am. Compl. ¶¶ 42-43).  Unlike the other counts, Count III,
fairly read, focuses on the plaintiffs' exposure to an
ultrahazardous product, which in this case appears to be tetryl.
(See id.).[8]  Neither of the parties specifically recognized the
jurisdictional significance of this strict liability claim in
their submissions, although they each noted that this action

_____

[8] Plaintiffs appear to found their strict liability claim in
both their exposure to an ultrahazardous product and the
existence of ultrahazardous working conditions.  Whether the
latter ground states a cognizable claim under the law of West
Virginia, or would, on its own, support a finding of subject-
matter jurisdiction, need not be considered.  It is clear, that
at a minimum, plaintiffs allege that defendants are strictly
liable as a result of plaintiffs' exposure to an ultrahazardous
product.

contained claims--ultrahazardous strict liability and fraud--that
were not included in the case of the similar action styled,
Cooper v. Magnum Coal Co., et al., Civil Action No. 2:07-318
(S.D. W. Va. Nov. 1, 2007), which had already been remanded by
Judge Faber.  (Explo Resp. to Mot. to Rem. at 4, 13; Reply to
Resp. to Mot. to Rem. at 11 n. 4).

        Because the causal connection analysis thus changes
with respect to Count III, the court revisits the four-factor
test used to determine whether the federal officer removal
statute applies.  As explained above, plaintiffs do not dispute
the first requirement that Explo is a "person" within the meaning
of the federal officer removal statute, and it clearly is.  See
supra pp. 8 n. 5.

        The second requirement that Explo acted under the
direction of a federal officer with respect to the portion of
Count III dealing with plaintiffs' exposure to tetryl is also
satisfied.  A contractual mandate by the government can be a
basis for satisfying the requirement that one has acted under the
direction of a federal officer.  See In re Methyl Tertiary Butyl
Ether ("'MTBE'") Products Liability Litig., 488 F.3d 112, 131
(2nd Cir. 2007) (internal quotation omitted) ("we agree, that 'in
most instances, a contract, principal-agent relationship, or

16

near-employee relationship with the government will be necessary to show the degree of direction by a federal officer necessary to invoke removal under 28 U.S.C. § 1442(a)(1).'"). Pursuant to its contract with the Army, Explo was to, among other things, provide all the necessary personnel in conducting the demilitarization of government furnished materials that were "unsafe for extensive handling or transportation." (Explo-Army Contract §§ 1.1, attached as Ex. B to Not. of Rem.). The government furnished material to be demilitarized contained tetryl. (Id. §§ 3.1, 4.1; Smith Aff't ¶¶ 2-4, 8, attached as Ex. C to Not. of Rem.). The exposure of plaintiffs to the allegedly ultrahazardous material of tetryl appears to have been in response to, or under the direction of, the contract with the Army.

As to the nexus or third requirement, keeping in mind the federal officer statute is to be liberally construed,[9] a

---

[9] Some district courts have suggested the federal officer removal statute should be construed broadly only when the immunity of federal officers is at issue, see Ryan v. Dow Chemical Co., 781 F. Supp. 934, 943 (E.D. N.Y .1992) (observing that the Supreme Court's jurisprudence since Willingham has signaled a "narrowing of § 1442"); Frieberg, 245 F. Supp. 2d at 1152 n.6 (citing Ryan and concurring that the federal officer removal statute should be "read expansively only when the immunity of individual federal officials, and not government contractors, is at issue."). However, the Supreme Court after these two decisions has made no such distinction in the context of discussing the statute's application to cigarette companies. Watson v. Philip Morris Companies, Inc., 127 S.Ct. 2301, 2304-05

17

causal connection exists between the alleged conduct and official
authority.  The plaintiffs' exposure to tetryl was a result of
Explo's performance of its duty pursuant to the contract with the
Army to demilitarize materials unsafe for extensive handling or
transportation, notwithstanding the fact that the Army did not
expressly require Explo to, in turn, contract with Nelson
Brothers so that these specific employees would be exposed to the
allegedly unsafe materials.  See supra at pp. 7-8.  The parties
do not raise the issue of whether the unspecified and potentially

---

(2007)(considering the application of § 1442(a)(1) to a private
entity, no mention of narrower construction).  The words of §
1442(a)(1) afford no basis for a more narrow construction of the
statute as applied to "any person acting under" an agency or
officer of the United States.  Further, unlike the court in
Frieberg, this court does not believe that Congress was any less
concerned with state interference with federal government
operations when executed directly by the federal government or
through government contractors.  See Watson, 127 S.Ct. at 2306
("the removal statute's 'basic' purpose is to protect the Federal
Government from interference with its 'operations.'").  But see
Frieberg, 245 F. Supp. 2d at 1152 n.6 ("Given the purpose of §
1442 and its basis in a mistrust of states and state courts to
protect federal interests, I agree it should be read expansively
only when the immunity of individual federal officials, and not
government contractors, is at issue.").  Finally, the Supreme
Court's statement that "one of the most important reasons for
removal [under § 1442(a)(1)] is to have the validity of the
defense of official immunity tried in a federal court,"
Willigham, 395 U.S. at 407, is noteworthy inasmuch as the
government contractor defense offered by the defendant, and
discussed infra, "inure[s] to the benefit of the contractor
because it . . . [is] derivative of the government's own immunity
from suit where the performance of a discretionary function is at
issue."  Winters, 149 F.3d at 400 (internal quotation omitted).

18

indirect relationship between the Army and subcontractor, Nelson
Brothers, breaks the causal chain.  The court believes it is
sufficient that the Army directed Explo to hire personnel to
handle the potentially unsafe material.

With respect to Count III, Explo has shown what <u>Mesa</u>
requires by excluding the possibility that the alleged
misconduct--exposure--was justified by something other than a
federal duty.  489 U.S. at 132.  Smith's affidavit together with
the contract between Explo and the Army have demonstrated that
tetryl was part of the government furnished material, "unsafe for
extensive handling or transportation," to be demilitarized
according to the contract.  (Smith Aff't ¶¶ 2-4, attached as Ex.
C to Not. of Rem.; Explo-Army Contract § 3.1, attached as Ex. B
to Not. of Rem.).  Count III asserts, at least in part, that
plaintiffs were harmed because of the exposure to the
ultrahazardous material.  (1st Am. Compl. ¶¶ 42-43).  There is a
causal connection between the conduct complained of in Count III
and the Army's contractual mandate to Explo.

Explo must further demonstrate that it has a colorable
federal defense, the fourth requirement.

> Courts have imposed few limitations on what qualifies
> as a colorable federal defense.  At its core, the
> defense prong requires that the defendant raise a claim

19

> that is "defensive" and "based in federal law."  <u>Mesa</u>,
> 489 U.S. at 129-30, 109 S.Ct. 959.  More specifically,
> such defense must "aris[e] out of [the party's]
> official duties."  <u>Arizona v. Manypenny</u>, 451 U.S. 232,
> 241, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981).

<u>Isaacson</u>, 517 F.3d at 138.  The court is mindful that it cannot require a federal officer "to virtually 'win his case before he can have it removed.'"  <u>Acker</u>, 527 U.S. at 431 (internal citation omitted).  Because the federal officer removal statute was designed to have the federal defenses of a federal officer litigated in federal court, this requirement should not be construed narrowly.  <u>Manypenny</u>, 451 U.S. at 242; <u>Willingham</u>, 395 U.S. at 405-407.  As the Second Circuit has noted, the "colorable" requirement is not synonymous with "clearly sustainable."  <u>Isaacson</u>, 517 F.3d at 139 (citing <u>Willingham</u>, 395 U.S. at 407).  "At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law."  <u>Willingham</u>, 395 U.S. at 406-407.

One of the two possible federal defenses offered by Explo is the government (or military) contractor defense as articulated in <u>Boyle v. United Techs. Corp.</u>, 487 U.S. 500, 507

(1988).  (Explo's Memo. in Supp. of M.T.D. at 9-11).[10]  The Fifth
Circuit has recognized that the government contractor defense is
colorable for § 1442 removal purposes.  <u>Winters v. Diamond
Shamrock Chemical Co.</u>, 149 F.3d 387, 401.[11]  Inasmuch as the
government contractor defense is defensive in posture, based in
federal law, and arises out of Explo's official duties as its
contract with the Army provides, the colorable defense
requirement is satisfied.

       At the time of the briefing on the motion to remand,
the similar action, <u>Cooper</u>, had, as noted, already been remanded
by Judge Faber.  In a footnote in their reply in response to the
motion to remand, plaintiffs stated they would be willing to

_____

       [10] **Explo discusses other federal defenses in its response to
the plaintiffs' motion to remand, but its previously filed
memorandum in support of the motion to dismiss invokes the
government or military contractor defense articulated in <u>Boyle</u>.
As a consequence, the court may consider it.**

       [11]  **There are district courts, however, that have taken the
opposite position and concluded § 1442 was not intended to be
used to evaluate the government contractor defense.  <u>Freiberg</u>,
245 F. Supp. 2d at 1151 n. 5; <u>Ryan</u>, 781 F. Supp. at 944.  The
court finds persuasive the Fifth Circuit authority of <u>Winters</u>.
Indeed, a subsequent decision of the Eastern District of New
York, authored by the same judge as <u>Ryan</u>, explained its prior
decision in <u>Ryan</u> is "no longer persuasive" and has been displaced
by <u>Winters</u>.  <u>In re Agent Orange Product Liability Litig.</u>, 304 F.
Supp.2d 442, 445 (E.D. N.Y. 2004) (Weinstein, J.).  <u>See</u> <u>also</u> <u>id.</u>
at 449 (holding, "[s]upport of removal [under § 1442(a)(1)] may
be predicated on the federal government contractor defense," and
collecting cases in support).**

voluntarily dismiss the strict liability and fraud claims --
which were added in this action but not present in Cooper -- if
the court found either of those two claims triggered application
of the federal officer removal statute.  (Reply to Resp. to Mot.
to Rem. at 11 n. 4).  Plaintiffs' earlier response to Explo's
motion to dismiss, however, requests that it be denied as to all
Counts, and that if any of the claims are insufficiently pled,
that they be granted leave to amend to cure any deficiencies.
Moreover, in addressing the propriety of federal jurisdiction in
a removal action, the court generally bases its decision on the
record existing at the time the petition for removal was filed.
St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 291
(1938). It thus appears that original federal jurisdiction exists
with respect to Count III's allegations against Explo.  The
motion to remand is, accordingly, denied.


          C.   Supplemental Jurisdiction


          Generally, the court has "supplemental jurisdiction
over all other claims that are so related to claims in the action
within such original jurisdiction that they form part of the same
case or controversy . . . ." 28 U.S.C. § 1367(a).  The
underlying factual predicate for all of the Counts is the same --

22

the plaintiffs' demilitarization of materials during their employment with Nelson Brothers.  Building off of that initial proposition are the claims for defendants' failure to warn or train, failure to provide protective clothing and equipment, instruction to plaintiffs to take tetryl home, and misrepresentations or omissions regarding the danger tetryl posed to plaintiffs and their families as well as the claimed ultra hazardous exposure of plaintiffs to tetryl.  (1st Am. Compl. ¶¶ 30, 32, 33, 34, 36, 42, 43, 44, 45, 47).  They arise from the same core of common facts.  See Rosmer v. Pfizer, Inc., 272 F.3d 243, 246 (4th Cir. 2001).

Though state law issues may predominate, requiring the parties to litigate the matter in two forums would needlessly complicate the process.  See United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 493 (4th Cir. 1998) ("Congress wanted, in enacting § 1367, to enable parties to resolve in one action all of their disputes arising from the same core of facts and thereby to conserve judicial resources . . . .").  The court exercises supplemental jurisdiction over all of the remaining claims.

Inasmuch as the plaintiffs' motion to remand was unsuccessful, the court does not award costs and fees to the plaintiffs in bringing this motion.  See 28 U.S.C. § 1447(c).

23

III.


Having determined that original jurisdiction exists
over Count III as to Explo and supplemental jurisdiction exists
over the remaining Counts against all of the defendants, the
court turns to the motions to dismiss of Explo and Elite.


A.  Motion to Dismiss Standard


Federal Rule of Civil Procedure 8(a)(2) requires that a
pleader provide "a short and plain statement of the claim showing
. . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2).  Rule
12(b)(6) correspondingly permits a defendant to challenge a
complaint when it "fail[s] to state a claim upon which relief can
be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide
"'fair notice of what the . . . claim is and the grounds upon
which it rests.'"  Bell Atlantic Corp. v. Twombly, 127 S. Ct.
1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47
(1957), overruled on other grounds, Twombly, 127 S. Ct. at
1969)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188
(4th Cir. 2007).  The showing of an "entitlement to relief"

24

amounts to "more than labels and conclusions . . . ." <u>Twombly</u>, 127 S. Ct. at 1965. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u>

The complaint need not, however, "make a case" against a defendant or even "forecast evidence sufficient to prove an element" of the claim. <u>Chao v. Rivendell Woods, Inc.</u>, 415 F.3d 342, 349 (4th Cir. 2005) (quoting <u>Iodice v. United States</u>, 289 F.3d 270, 281 (4th Cir. 2002)). Instead, the opening pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." <u>Twombly</u>, 127 S. Ct. at 1965. Stated another way, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 1974.

Application of the Rule 12(b)(6) standard also requires that the court "'accept as true all of the factual allegations contained in the complaint . . . .'" <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007) (quoting <u>Twombly</u>, 127 S. Ct. at 1965; <u>see also</u> <u>South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co.</u>, 372 F.3d 245, 255 (4th Cir. 2004) (quoting <u>Franks v. Ross</u>, 313 F.3d 184, 192 (4th Cir. 2002)). The court is additionally required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor . . . ."

25

<u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999).

Explo asserts that the discretionary function exception and the government (or military) contractor defense apply to it. Co-defendant Elite states that plaintiffs did not work at its site and thus it cannot be liable. Further, Explo and Elite assert that the first amended complaint suffers from various pleading deficiencies entitling them to dismissal.

> B.  Discretionary Function Exception to Federal Tort
>     Claims Act's Waiver of Sovereign Immunity

The Federal Tort Claims Act ("FTCA") makes the United States liable in tort in certain circumstances by providing for a waiver of the United States' sovereign immunity. 28 U.S.C. § 2680(a). The discretionary function exception is to the FTCA's waiver of the United States' sovereign immunity. <u>See</u> <u>id.</u> When the exception applies, sovereign immunity for the United States is present. <u>See</u> <u>id.</u> As a private defendant -- even as one working with the Army -- Explo is, quite plainly, not entitled to sovereign immunity. <u>See</u> <u>id.</u> The lone case cited by Explo in support of its argument for invocation of the discretionary function exception, <u>Conlon v. United States</u>, 959 F. Supp. 683, 684, 688 n. 2 (D. N.J. 1997), demonstrates the point. In <u>Conlon</u>,

the defendant reaping the benefit of the discretionary function exception was the United States, not a private contractor.  959 F. Supp. at 688 n. 2.  The discretionary function exception does not preclude a judgment against Explo.

C.  Government (or Military) Contractor Defense

In 1988, the Court firmly established the concept of the government contractor defense.  Boyle, 487 U.S. at 504-513. This affirmative defense to state law claims extends the immunity afforded to the federal government's discretionary functions under the Federal Tort Claims Act to government contractors in the form of a defense under certain circumstances.  Id. at 511- 513.  The Court in Boyle held that a government contractor which provided helicopters to the military was not liable under state tort law for a fatal accident caused by a design defect.  Id. at 505.  The rationale for extending protection to contractors was explained as "[i]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production."  Id. at 512.  The essence of the defense is to "prevent the contractor from being held liable when the

27

government is actually at fault . . . ."  **Trevino v. General Dynamics Corp.**, 865 F.2d 1474, 1478 (5th Cir. 1989).

Though the **Boyle** defense can certainly be found in the context of summary judgment, **see**, **e.g.**, **Hudgens v. Bell Helicopters/Textron**, 328 F.3d 1329 (11th Cir. 2003); **Kleeman v. McDonnell Douglas Corp.**, 890 F.2d 698 (4th Cir. 1989), **cert. denied**, 495 U.S. 953, (1990); **Ramey v. Martin-Baker Aircraft Co.**, 874 F.2d 946 (4th Cir. 1989); **Smith v. Xerox Corp.**, 866 F.2d 135 (5th Cir. 1989); **Houghtaling v. Unisys Corp.**, 955 F. Supp. 309 (D. N.J. 1996); **Niemann v. McDonnell Douglas Corp.**, 721 F. Supp. 1019 (S.D. Ill. 1989); **Nicholson v. United Technologies Corp.**, 697 F. Supp. 598 (D. Conn. 1988), or in the context of a judgment notwithstanding the verdict, **see**, **e.g.**, **Boyle**, 487 U.S. at 514; **Harduvel v. General Dynamics Corp.**, 878 F.2d 1311 (11th Cir. 1989), **cert. denied**, 494 U.S. 1030 (1990), granting it on a motion to dismiss is another matter.

As explained by Explo, for the defense to be present, the subject matter must involve a "uniquely federal interest" and a "significant conflict" must exist between the requirements of state law and the contractor's obligations to the federal government.  **Boyle**, 487 U.S. at 506-507, 511-512.  In a footnote to **Boyle**, the Court noted "liability of independent contractors

28

performing work for the Federal Government, like the liability of federal officials, is an area of uniquely federal interest." Id. at 505 n. 1.  In confining the scope of the defense, the Court set forth three further requirements for its application in the following statement:

> [l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

Id. at 512.

The Boyle formulation of government approval, contractor conformity with the approval, and disclosure of the danger has been extended beyond the context of a defective design in furtherance of a procurement contract.  See, e.g., Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329, 1335 (11th Cir. 2003) (service contract for the maintenance of military helicopters); Densberger v. United Technologies Corp., 297 F.3d 66, 75 (2d Cir. 2002) (failure-to-warn case); Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003-04 (7th Cir. 1996), cert. denied, 520 U.S. 1116 (1997) (same).[12]

_____

[12] In a case where the contract at issue was for the maintenance of military helicopters, the Eleventh Circuit adapted

It appears the majority of jurisdictions have concluded the reasoning of Boyle should apply to failure-to-warn claims. See Emory v. McDonnell Douglas Corp., 148 F.3d 347, 350 (4th Cir. 1998) ("many circuits have since held that the defense should apply to failure to warn claims") (internal citations omitted); Densberger, 297 F.3d at 75 (applying Boyle to failure-to-warn claim); Oliver, 96 F.3d at 1003 ("It is well established that the government contractor defense . . . may operate to defeat a state failure-to-warn claim."). In failure-to-warn cases, like all other cases where Boyle provides a defense, the government contractor must have acted in accordance with a governmental directive. See Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582, 586 (9th Cir. 1996) (stating that the government contractor defense "is inapplicable to a failure to warn claim in the absence of evidence that in making its decision whether to

_____

the formulation in Boyle to foreclose liability when the following was present: (1) the United States approved reasonably precise maintenance procedures; (2) the contractor's performance of maintenance conformed to those procedures; and (3) the contractor warned the United States about the dangers in reliance on the procedures that were known to the contractor but not to the United States. Hudgens, 328 F.3d 1335. Similarly, in adapting the three requirements of Boyle to failure-to-warn cases, the Second Circuit has described them as follows: "(1) 'government control over the nature of product warnings'; (2) 'compliance with the Government's directions'; and (3) 'communication to the Government of all product dangers known to it but not to the Government.'" Densberger, 297 F.3d at 75.

provide a warning . . . [the government contractor] was acting in compliance with reasonably precise specification imposed on it by the United States.").

Our court of appeals has suggested it would employ the approach of applying the <u>Boyle</u> framework to the failure-to-warn context. <u>Emory</u>, 148 F.3d at 350 (collecting cases holding that the government contractor defense applies to failure-to-warn claims and finding them "to be reasoned soundly.").  The court now proceeds to consider the effect of an extension of <u>Boyle</u> to Count I, II and IV wherein claims are alleged for failure to train, failure to provide protective clothing and equipment, instruction to plaintiffs to take tetryl home, and misrepresentations or omissions regarding the danger tetryl posed to plaintiffs and their families.

The first <u>Boyle</u> requirement of federal government control or approval of reasonably precise specifications envisions that the federal contractual duties conflict with state tort law duties; and it confines the government contractor defense to its proper scope by requiring that the alleged misconduct was considered by a government officer, and not merely the contractor itself.  <u>Boyle</u>, 487 U.S. at 512; <u>In re Agent Orange Product Liability Litig.</u>, 517 F.3d 76, 93 (2nd Cir. 2008)

(quoting <u>Lewis v. Babcock Industries, Inc.</u>, 985 F.2d 83, 86 (2nd
Cir. 1993)).  "Alternatively, where a 'contractor could comply
with both its contractual obligations and the state-prescribed
duty of care,' displacement [of state law] 'generally' would not
be warranted, and state law would apply."  <u>Agent Orange</u>, 517 F.3d
at 93 (quoting <u>Boyle</u>, 487 U.S. at 509).

        Explo could have complied with both its contractual
obligations and the state-prescribed duties of care at issue in
Counts I, II, and IV.  As already noted, those alleged failures,
instructions and misrepresentation attributed to Explo do not
appear to be pursuant to any direction by the Army.  The
allegations are that Explo's improper conduct was beyond the
scope of the requirements in the contract.  There is no
significant conflict between the state tort duties and the
federal contractual requirement.  Applying the first requirement
in <u>Boyle</u>, the court finds the government contractor defense is
not a basis for granting Explo's motion to dismiss to Counts I,
II, and IV.  <u>See</u> <u>Agent Orange</u>, 517 F.3d at 93.

        Count III is different inasmuch as it is not grounded,
at least by and large, on defendants' failures, instructions, or
misrepresentations.  (1st Am. Comp. ¶¶ 42-43).  Instead, it
relies on the exposure of plaintiffs to an ultrahazardous

material.  (Id.).

　　　　Even assuming the court could consider the contract between Explo and the Army and the Smith affidavit here, which it cannot inasmuch as they are not integral to any affirmative allegations contained in the complaint, see Trimble Navigation, 484 F.3d at 705, Explo's motion to dismiss nevertheless fails.[13] Section 1.1 of the contract required Explo to furnish the labor, and that section demonstrates the parties knew at least that the material to be demilitarized was "unsafe for extensive handling or transportation[.]"  (Explo-Army Contract § 1.1, attached as Ex. B to Not. of Rem.).  The Smith affidavit established that the government-furnished material contained tetryl.  (Smith Aff't ¶ 4, attached as Ex. C to Not. of Rem.).  Further factual development, at least with respect to the actual demilitarization

---

[13] Though the contract and Smith's affidavit are integral to whether remand is appropriate, as stated above, they are not integral to the affirmative allegations in the first amended complaint.  The first amended complaint only refers to the contract in a single paragraph where it states, "[p]rior to February 2007, Catenary entered into contract with Nelson Brothers, Explo and Elite for various services, including the requirement that Nelson Brothers have its employees utilize a chemical substance (Tetryl) as an explosive in performing their duties and responsibilities."  (1st Am. Compl. ¶ 11).  The allegations otherwise sound in tort and are not dependent upon the provisions of the contract or Smith's averments.  The court declines to consider the contract or Smith's affidavit in the context of the motions to dismiss.

process, is needed.

As to Count III, in addressing the second <u>Boyle</u>
requirement that Explo's alleged misconduct must conform to the
scope of the federal government's approval, it is unclear whether
"demilitarization" as defined in the contract could have been
accomplished in such a way that plaintiffs were not exposed to a
dangerous level of tetryl.  The factual record regarding the
actual demilitarization process simply has not been developed,
and the court cannot make a determination in favor of Explo at
this juncture.  Along those same lines, the "ultrahazardous"
exposure alleged in the first amended complaint is not
necessarily akin to the material designated in the contract as
"unsafe for extensive handling or transportation."  It may be
that the demilitarization process performed was not in accord
with the conduct approved of by the Army in the contract.  This
area also needs further exploration.  The government contractor
defense does not prohibit plaintiffs' claims at this stage of the
litigation.[14]

_____

[14] For jurisdictional purposes, the court found that Explo
had established by a preponderance of the evidence with its
contract with the Army and the affidavit of its vice president
(keeping in mind that jurisdiction based on the federal officer
removal statute must be liberally construed) that a causal
connection existed between the exposure of plaintiffs to tetryl
and the federal direction to demilitarize munitions containing

D.  Pleading Deficiencies


Relying on the <u>Twombly</u> decision, defendants Explo and Elite contend that the first amended complaint suffers from two types of pleading deficiencies.  First, they argue dismissal is warranted because the first amended complaint fails to allege the precise dates and locations, including the particular mine sites and counties, of the incidents.  (Explo Memo. in Supp. of M.T.D. at 16-17; Elite Memo. in Supp. of M.T.D. at 6-7).  This assertion is not a basis for granting a motion to dismiss.  <u>See</u> <u>Twombly</u>, 127 S.Ct. at 1965.

Second, Elite contends that plaintiffs' claims should be dismissed because the plaintiffs were not "placed" at Catenary Coal Co.  (Elite Memo. in Supp. of M.T.D. at 7-8).  In other words, the plaintiffs did not work for Elite or work at its site.  Plaintiffs respond that Elite has ignored the allegations of the particular wrongdoing of Elite and, further, that plaintiffs have

---

tetryl.  Yet, it cannot be said at this point as a matter of law (while drawing all reasonable inferences in the plaintiffs' favor) that the Army approved reasonably precise specifications in exposing plaintiffs to tetryl and that Explo conformed to those specifications such that dismissal of Count III is warranted under the government contractor defense.

alleged defendants engaged in a joint venture or conspiracy.
(Pls.' Resp. to Elite M.T.D. at 12, citing Am. Compl. ¶¶ 12, 21,
22, 23, 25).  The court finds Elite's argument does not provide a
basis for granting its motion to dismiss.

Third, Explo and Elite discuss particular problems with
Counts II, III, IV, and VI.  (Explo Memo. in Supp. of M.T.D. at
17-20; Elite Memo. in Supp. of M.T.D. at 1, 7-10).

1.   Count II

Explo and Elite point out that a deliberate intent
claim could only be made against an employer, and they were not
plaintiffs' employer.  (Explo Memo. in Supp. of M.T.D. at 17-18;
Elite Memo. in Supp. of M.T.D. at 8).  Plaintiffs acknowledge
that their claim of deliberate intent pursuant to W. Va. Code §
23-4-2 was not asserted against Explo or Elite but, rather, only
against the plaintiffs' actual employer.  (Pls.' Resp. to Explo
M.T.D. at 21; Pls.' Resp. to Elite M.T.D. at 13).  They contend,
"such claim need not be dismissed inasmuch as it was never
plaintiffs' intention to pursue such statutory claim" against
Explo or Elite.  (Id.).  While the court agrees Count II should
not be dismissed in its entirety, it is dismissed with respect to

36

Explo and Elite, who are not alleged to be employers of the
plaintiffs.


2.   Count III


        Elite argues it cannot be liable under a strict
liability theory first because it was neither the manufacturer
nor seller of a defective product.  (Elite Memo. in Supp. of
M.T.D. at 8-9).  This argument is not a basis for dismissing a
strict liability claim based on ultrahazardous instrumentalities.
See, e.g., Peneschi, 170 W. Va. at 515, 295 S.E.2d at 5.  Elite's
other contention is that it did not expose plaintiffs to an
ultrahazardous product.  (Elite Memo. in Supp. of M.T.D. at 9).
Because at this juncture the plaintiffs' allegations that all of
the defendants exposed them to an ultrahazardous product must be
accepted as true, the argument fails.  (1st Am. Compl. ¶¶ 42-43).


3.   Count IV


        Rule 9(b) of the Federal Rules of Civil Procedure
requires that "the circumstances of fraud or mistake shall be
stated with particularity."  Fed. R. Civ. P. 9(b).  "[L]ack of
compliance with Rule 9(b)'s pleading requirements is treated as a

failure to state a claim under Rule 12(b)(6)."  <u>Harrison v.
Westinghouse Savannah River Co.</u>, 176 F.3d 776, 783-784 (4th Cir.
1999).  To satisfy the requirement of Rule 9(b), plaintiffs must
plead "the time, place and contents of the false representations,
as well as the identity of the person making the representations
and what he obtained thereby."  <u>U.S. ex rel. Wilson v. Kellogg
Brown & Root, Inc.</u>, 525 F.3d 370, 379 (4th Cir. 2008) (citing
<u>Harrison</u>, 176 F.3d at 784).  For obvious reasons, allegations of
material omissions may require less particularity.  <u>In Town
Hotels Ltd. P'ship v. Marriott Int'l, Inc.</u>, 246 F. Supp. 2d 469,
487 (S.D. W. Va. 2003) (internal citation omitted).

  Furthermore, our court of appeals has cautioned that,

> [a] court should hesitate to dismiss a complaint under
> Rule 9(b) if the court is satisfied (1) that the
> defendant has been made aware of the particular
> circumstances for which she will have to prepare a
> defense at trial, and (2) that plaintiff has
> substantial prediscovery evidence of those facts.

<u>Harrison</u>, 176 F.3d at 784.  In accordance with this principle,
plaintiffs request that, should the court find more particularity
is required, they be afforded an opportunity to amend their first
amended complaint.  (Pls.' Resp. to Explo M.T.D. at 20, 25; Pls.'
Resp. to Elite M.T.D. at 19).

  The court finds plaintiffs have not pled their fraud

allegations with the requisite particularity of Rule 9(b).[15]   The
court directs the plaintiffs to file a motion to amend Count IV
by adding the allegations just noted above, as required by Rule

---

[15] After incorporating by reference all previous allegations,
plaintiffs alleged in their fraud claim the following:

44.   Defendants, and each of them, acting as aforesaid,
represented to plaintiffs that Tetryl was safe and
would cause no harm, and omitted telling
plaintiffs of Tetryl's danger to plaintiffs and
their families.

45.   Defendants had an express duty to advise
plaintiffs of the danger and precautions that
should be utilized in handling Tetryl.

46.   Plaintiffs relied on defendants to tell them all
significant and material information concerning
Tetryl and its dangers as plaintiffs had a right
to do.

47.   Defendants misrepresented the facts of Tetryl's
dangers by omission and by overt statements that,
in effect, it would not cause harm.

48.   As a proximate result of defendants' acts and
omissions in misrepresenting facts, plaintiffs
were damaged as aforesaid.

(1st Am. Compl. ¶¶ 44-48).  Plaintiffs have alleged that "Elite
negligently and intentionally failed to provide plaintiffs,
directly or indirectly, with instructions and/or warnings or
protective clothing in their use of Tetryl in and around
plaintiffs' workplace[,]" (id. ¶ 19), and that the defendants,
including Elite, "caused plaintiffs excessive worry and emotional
distress, both from past medical injuries to themselves and
family members and from the increased risk of future illnesses
and injuries."  (Id. ¶ 55).  The other allegations in the first
amended complaint are not especially helpful in setting forth the
particulars of the alleged fraud.

9(b), accompanied by a proposed amended complaint, on or before
October 13, 2008, should they wish to pursue Count IV, in default
of which Count IV will be ordered dismissed.

4.    Count VI

        The first amended complaint does not specify whether
Count VI seeks relief for the negligent infliction of emotional
distress or the intentional infliction of emotional distress.
The Supreme Court of Appeals of West Virginia has explained that
West Virginia law recognizes claims for both negligent and
intentional inflictions of emotional distress.   Marlin v. Bill
Rich Const., Inc., 198 W. Va. 635, 653, 482 S.E.2d 620, 638
(1996).

        With respect to negligent infliction of emotional
distress, it has stated,

        we hold that in order to recover for negligent
        infliction of emotional distress based upon the fear of
        contracting a disease, a plaintiff must prove that he
        or she was actually exposed to the disease by the
        negligent conduct of the defendant, that his or her
        serious emotional distress was reasonably foreseeable,
        and that he or she actually suffered serious emotional
        distress as a direct result of the exposure.

Id.  Plaintiffs' first amended complaint alleges that they
experienced emotional distress, (1st Am. Compl. ¶ 55), because of

40

the negligence of the defendants, including Explo and Elite, in exposing them to tetryl, (id. ¶ 33-35) a substance which can severely injure (id. ¶ 25-26).  That the emotional distress was "serious," "reasonably foreseeable," and "as a direct result of the exposure" has not been specifically alleged, but could be inferred from the first amended complaint.  The court certainly cannot say at this stage of the litigation as a matter of law that the emotional distress was not reasonably foreseeable or not serious.  The court thus finds Count VI should not be dismissed.

With respect to a claim for intentional infliction of emotional distress, the Supreme Court of Appeals of West Virginia has explained,

> In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established.  It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. pt. 3, Travis v. Alcon Laboratories, 202 W. Va. 369, 504 S.E.2d 419 (1998).

41

To satisfy the first element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." Keyes v. Keyes, 182 W. Va. 802, 805, 392 S.E.2d 693, 696 (1990) (quoting Restatement (Second) of Torts § 46 cmt. D (1965)). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against that actor, and lead him to exclaim, "Outrageous!" McCammon v. Oldaker, 205 W. Va. 24, 32, 516 S.E.2d 38, 46 (1999) (quoting Tanner v. Rite Aid of West Virginia, Inc., 194 W. Va. 643, 651, 461 S.E.2d 149, 157 (1995)).

The role of the court, in the first instance, is to evaluate "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." Syl pt. 7, Love v. Georgia-Pacific Corp., 209 W. Va. 515, 550 S.E.2d 51 (2001).  Thus, it is for the court to determine whether the plaintiffs' allegations are sufficient to state a claim for outrageous conduct as a matter of law.

The West Virginia Supreme Court has commented that the tort of outrageous conduct "is a difficult fact pattern to prove."  Hines v. Hills Dept. Stores, Inc., 193 W. Va. 91, 96,

454 S.E.2d 385, 390 (1994).  Because that court found it so difficult to define what conduct constitutes outrageous conduct, the court observed, "we define what it is not on a case-by-case basis."  Id.  The tort of intentional infliction of emotional distress is thus heavily dependent on the facts.

The extent of any intentional misconduct of Explo and Elite is not readily apparent. It is worthy of note that in a case involving Virginia law, our court of appeals has had occasion to reverse a district court's dismissal of an intentional infliction of emotional distress claim because it was premature to rule as a matter of law that the defendant's acts were not outrageous.  Baird ex rel. Baird v. Rose, 192 F.3d 462, 472-473 (4th Cir. 1999).  The same logic applies here.

The portions of the motions to dismiss of Explo and Elite dealing with Count VI are denied.  Nevertheless, the plaintiffs are directed to clarify whether they wish to pursue negligent or intentional emotional distress, or both, and plead with such greater specificity as may be requisite in the amendment to the first amended complaint.

IV.


In their motions to compel arbitration and stay proceedings pending arbitration, the Nelson Brothers and John Rucker request that arbitration be ordered as to them. Plaintiffs filed a motion requesting that the court defer the requirement that they respond in view of the pending motion to remand. Having found federal jurisdiction exists, the plaintiffs are directed to file their response to the corrected motion of Nelson Brothers and John Rucker to compel arbitration, should they so desire, on or before October 3, 2008, with any reply by Nelson Brothers and John Rucker due on or before October 13, 2008.


V.


It is, accordingly, ORDERED as follows:

1.  The motion to remand be, and it hereby is, denied;

2.  Plaintiffs' request for fees and costs in bringing the motion to remand be, and it hereby is, denied;

3.   Explo's motion to dismiss be, and it hereby is,

**44**

denied except that Count II is dismissed as to it;

4.   Elite's motion to dismiss and amended motion to dismiss be, and they hereby are, denied except that Count II is dismissed as to it;

5.   Plaintiffs be, and they hereby are, directed to file a proposed second amended complaint on or before October 13, 2008 addressing the lack of particularity found in Count IV and clarifying their infliction of emotional distress claim in Count VI;

6.  Plaintiffs be, and they hereby are, directed to file a response, should they wish to do so, to the corrected motion of Nelson Brothers and John Rucker to compel arbitration and to stay proceedings pending arbitration, on or before October 3, 2008, with any reply due on or before October 13, 2008; and

7.   The motion of plaintiffs to defer response to the corrected motion to compel arbitration and stay proceedings be, and it hereby is, granted to the extent directed above.

8.   The initial motion of Nelson Brothers and John

**45**

Rucker to compel arbitration and stay proceedings pending arbitration, filed January 18, 2008, be, and it hereby is, denied as moot.

9.    Except as set forth in paragraphs numbered five and six above, all proceedings herein are stayed until the further order of the court.

10.   Lead counsel for the parties shall appear for a status conference with the court at 3:00 p.m. on October 3, 2008.

The Clerk is directed to forward a copy of this memorandum opinion and order to all counsel of record.

DATED: September 25, 2008

John T. Copenhaver, Jr.
United States District Judge